In
The

                                                Court
of Appeals

                        Sixth
Appellate District of Texas at Texarkana

 

                                                ______________________________

 

                                                             No. 06-09-00046-CV

                                                ______________________________

 

 

                    ENBRIDGE PIPELINE (EAST TEXAS)
L.P., Appellant

 

                                                                V.

 

                                  AVINGER TIMBER, L.L.C., Appellee

 

 

                                                                                                  


 

 

                                       On Appeal from the 276th
Judicial District Court

                                                            Marion County, Texas

                                                          Trial Court
No. 0400066

 

                                                                                                   

 

 

                                          Before Morriss, C.J.,
Carter and Moseley, JJ.

                                                          Opinion by Justice Carter








                                                                   O P I N I O N

 

I.          INTRODUCTION

            Is
the value of a bare and undeveloped tract of rural real estate equivalent to
the value of rural real estate that (1) has been leased by the owner to several
gas companies for over thirty years as a gas processing plant, (2) has more
than fifteen pipelines entering the property, and (3) has all the proper
permits for use as a gas processing plant? 
The condemnor, Enbridge Pipeline, argues yes.  We disagree. 
We do not believe the bare real estate tract is equivalent to the tract
involved here.  From that conclusion, we
find the appraiser for the landowner was properly allowed to testify, and the
appraiser for the gas company was properly excluded.  We will affirm the judgment of the trial
court. 

            Enbridge
Pipeline, L.P. (Pipeline) appeals a jury’s $20,955,000.00 condemnation award
to Avinger Timber, L.L.C. (AV).  Pipeline
alleges the trial court erred in:  (1) denying
its Daubert/Robinson[1]
motion against AV’s valuation expert, David Bolton; (2) striking its expert,
Albert Allen; (3) denying its motion for directed verdict and motion for
judgment notwithstanding the verdict; and (4) failing to submit its proposed
jury instructions.  We determine the
trial court was within its discretion in admitting Bolton’s testimony regarding
fair market value of the condemned property, while excluding Allen’s testimony
for his use of improper methodology.  Due
to our determination of these dispositive issues, and Pipeline’s failure to
preserve any alleged error in the jury charge, we affirm the trial court’s
judgment.  

II.        FACTUAL AND PROCEDURAL
HISTORY

            The
main issue in this case is the fair market value of AV’s land on the date it
was condemned by Pipeline.  The history
of this land is essential in understanding the experts’ valuations.  The condemned land has been owned by the
Simpson family and their company, AV, since the mid-1950s.  In 1973, Roland Simpson leased 23.79 acres
out of his 418-acre property to Tonkawa Gas Processing Company[2]
for the purpose of building and operating gas processing facilities.  The first lease “was a 10-year lease with a
renewal after every 10 years for another 10 years” as a continuing option,
which indefinitely postponed AV’s right of reversion.  Annual rent for the land was $500.00.[3]  Tonkawa built a large natural gas processing plant
atop the land in 1973.[4]  Fifteen or sixteen separate natural gas
pipelines owned by various companies were connected to the plant over the
years, and the site became a known processing hub.

            Tonkawa
renewed the lease in 1984, for fifteen years, on the same terms, except that
rent was increased to $4,000.00 per year. 
Evidence was presented that the Simpsons did not have a complete
understanding of what the land was worth at this time.[5]  Tonkawa sold the plant to Koch Midstream
Processing,[6]
successor of Tonkawa’s lease interest, and AV took Roland’s place as successor
lessor. 

            In
1998, these parties renewed the 1984 lease, but on different terms.  First, the lease became a short, three-year
term, with the first term ending April 2, 2001, with another three-year
option.  The annual rent increased to
$22,265.00.  A major difference from the
earlier leases was that Koch’s right of never-ending lease renewals was
removed, giving AV a valuable reversionary interest in the land.  According to industry expert Donald W.
Niemiec, this major concession was made with the understanding that “[i]f [the
amount of rent] went to arbitration . . . the rent would be quite high,”
approximately $2.5 million per year.  He
characterized the lease as “unique in that it expires.  Most all processing plants own it or have a
forever lease on it.”  Upon expiration of
the three-year lease, the lessee had the option of renewing the lease, buying
the land, or selling the lease and/or removing the plant.  The lease was renewed in 2001 with an April
2, 2004, expiration date.  Enbridge
Processing (Processing) became the natural gas plant operator and successor to
Koch’s interest in November 2001.[7]


            With
the lease expiration date looming,[8]
Pipeline (not Processing) sent a March 10, 2004, $35,685.00 offer to AV
for purchase of the fee interest.  The
letter informed AV it had until 4:00 p.m. on March 12, 2004, to agree to
the purchase price or face condemnation proceedings.  On March 11, 2004, Processing merged with
Pipeline, a public utility company, and secured the right to acquire the
property through eminent domain.  A
petition for condemnation by Pipeline was filed on March 18, 2004.  Commissioners awarded AV $47,580.00 for the
condemnation after AV failed to appear at the valuation hearing.  AV objected to the commissioners’ default
award and went to trial on one issue—the fair market value of the condemned
acreage.[9]


            Daubert/Robinson challenges were made to
both parties’ experts, with the main question being whether the expert was
entitled to consider the gas processing plant in valuing the land underneath
it.  The trial court answered the
question in the affirmative.  Because
Pipeline’s expert valued the land as vacant rural residential property, the
trial court struck his testimony, finding his opinion unreliable and based upon
improper methodology.  The court also
denied Pipeline’s motion to strike AV’s expert and allowed him to testify
because he considered all existing factors in determining the land’s fair
market value.  After hearing AV’s expert
testimony, the jury found the surface interest of the condemned land was worth
$20,955,000.00.

            We
first consider the trial court’s Daubert/Robinson
rulings.   

III.       THE DAUBERT/ROBINSON ANALYSIS

            “[I]t
is not permissible for the jury to consider mere speculative contingencies nor
is testimony which ascends to the realm of speculations and fancies that may
occur to the minds of optimistic witnesses concerning the future prospects of
[condemned] property and its value admissible.” 
McChristy v. Hall County, 140
S.W.2d 576, 578 (Tex. Civ. App.—Amarillo 1940, no writ).  The trial court must act as evidentiary
gatekeeper to screen irrelevant and unreliable expert evidence.  Exxon
Pipeline Co. v. Zwahr, 88 S.W.3d 623, 629 (Tex. 2002).  It has broad discretion with respect to this
function.  Id.; Gen. Elec. Co. v. Joiner,
522 U.S. 136 (1997); In re Estate of
Trawick, 170 S.W.3d 871, 874 (Tex. App.—Texarkana 2005, no pet.).  In determining whether an abuse of discretion
occurred in the inclusion of Bolton’s testimony and the exclusion of Allen’s,
we look to see whether the trial court acted without reference to guiding
principles or rules.  Downer v. Aquamarine Operators, Inc.,
701 S.W.2d 238, 241–42 (Tex. 1985).  We
cannot conclude that a trial court abused its discretion merely because we
would have ruled differently.  Id. at 242; Purina Mills, Inc. v. Odell, 948 S.W.2d 927, 932 (Tex.
App.—Texarkana 1997, writ denied).  

            A.        Standard of Review 

            In
addition to demonstrating that an expert witness is qualified, the expert’s
testimony must be relevant to the issues in the case and based upon a reliable
foundation.  Tex. R. Evid. 401; Cooper
Tire & Rubber Co. v. Mendez, 204 S.W.3d 797, 800 (Tex. 2006); Zwahr, 88 S.W.3d at 628; Robinson, 923 S.W.2d at 556 (citing Daubert, 509 U.S. 579).  The parties do not dispute the qualifications
of either witness.  Thus, we look to
relevance and reliability.  

            Rule
702 of the Texas Rules of Evidence states that if “technical, or other
specialized knowledge will assist the trier of fact to understand the evidence
to determine a fact in issue, a witness qualified as an expert by knowledge,
skill, experience, training, or education may testify thereto in the form of an
opinion or otherwise.”  Tex. R. Evid. 702.  In Kumho
Tire Co. v. Carmichael, the United States Supreme Court suggested that the Daubert standard is flexible and that
the trial court should “make certain that an expert, whether basing testimony
upon professional studies or personal experience, employs in the courtroom the
same level of intellectual rigor that characterizes the practice of an expert
in the relevant field.”  526 U.S. 137,
152 (1999).  Expert testimony is
unreliable if it is not grounded in “the methods and procedures of science,”
and is no more than “subjective belief or unsupported speculation,” or there is
too great an “analytical gap” between the data and the expert opinion
offered.  Robinson, 923 S.W.2d at 557; Zwahr,
88 S.W.3d at 629; see Merrell Dow Pharms.,
Inc. v. Havner, 953 S.W.2d 706, 712 (Tex. 1997).  In reviewing the reliability of expert
testimony, a trial court does not determine whether the expert’s conclusions
are correct; rather, the court should determine only whether the analysis used
to reach those conclusions is reliable.  Zwahr, 88 S.W.3d at 629; City of Sugarland v. Home & Hearth
Sugarland, L.P., 215 S.W.3d 503, 510–11 (Tex. App.—Eastland 2007, pet.
denied).  

            “Reliability
is determined by looking at numerous factors including those set forth in Robinson and Daubert.”  Havner, 953 S.W.2d at 712.  These include:

(1) the extent to which the theory has been or can
be tested; (2) the extent to which the technique relies upon the subjective
interpretation of the expert; (3) whether the theory has been subjected to
peer review and publication; (4) the technique’s potential rate of error; (5)
whether the underlying theory or technique has been generally accepted as valid
by the relevant scientific community; and (6) the non-judicial uses that
have been made of the theory or technique.

 

Id. at 714 (citing Robinson,
923 S.W.2d at 557).  

            A
certified or licensed real estate appraiser is required to comply with the
Uniform Standard of Professional Appraisal Practice adopted by the Appraisal
Standards Board of the Appraisal Foundation, or other similarly strict
standards must be used.  Tex. Occ. Code Ann. § 1103.405
(Vernon Supp. 2010).  Additionally, the
appraiser should use an appraisal method which passes Daubert/Robinson muster. 
Texas courts have recognized that the comparable sales, income
capitalization, and replacement cost methods meet these standards, as they have
been tested, proven to require objective analysis, widely publicized, subjected
to peer review, generally accepted by appraisers, and utilized in appraisals
outside of the courtroom.  In re Marriage of Rice, 96 S.W.3d 642,
647 (Tex. App.—Texarkana 2003, no pet.). 
These methods are discussed in detail below. 

            If
an appraiser utilizes improper methodology or misapplies established rules and
principles, resulting testimony is unreliable, irrelevant, and must be
excluded.  Zwahr, 88 S.W.3d at 631 (trial court erred in allowing testimony of
appraiser who improperly applied project enhancement rule); City of Harlingen v. Estate of Sharboneau,
48 S.W.3d 177, 188–89 (Tex. 2001) (Baker, J., concurring) (trial court erred in
admitting appraisal of expert who improperly utilized subdivision development
analysis method of appraisal).  Further, “unless
an appraisal gives a value based on the land’s condition at the time of
condemnation -- taking into account all relevant factors that affect its
valuation, including the market for its possible future use -- it is not relevant
to the issue of market value.”  Id. at 185.

            B.        The Law of Condemnation and Permissible
Methods of Appraisal[10]


            “Eminent
domain has been described as ‘one of the inalienable rights of
sovereignty.  It is the power to take
private property for public use.’”  State v. Ware, 86 S.W.3d 817, 821–22
(Tex. App.—Austin 2002, no pet.) (citing
Fort Worth & D.C. Ry. v. Ammons, 215 S.W.2d 407, 409 (Tex. Civ.
App.—Amarillo 1948, writ ref’d n.r.e.)). 
“[I]t is axiomatic that government cannot take a citizen’s property
without payment of the property’s fair value.” 
Id. at 822.  Thus,
both the United States and Texas Constitutions require governments to
compensate landowners for takings of their property.  U.S.
Const. amend. V (requiring “just compensation”); Tex. Const. art. I, § 17 (“No person’s property shall be
taken, damaged, or destroyed for or applied to public use without adequate
compensation being made.”).  When a
government condemns real property, the normal measure of damages is the land’s
market value.  Tex. Prop. Code Ann. § 21.042(b) (Vernon Supp. 2010).  Where a condemnor’s offer for the price of
land is refused, “the objective of the judicial process under the constitution
and statutes is to make the landowner whole.” 
City of Fort Worth v. Corbin,
504 S.W.2d 828, 831 (Tex. 1974); Zwahr,
88 S.W.3d at 628.  “The general rule for
determining fair-market value is the before-and-after rule, which requires
measuring the difference in the value of the land immediately before and
immediately after the taking.”  Zwahr, 88 S.W.3d at 627.  

            The
question of market value is “peculiarly one for the fact finding body.”  Tex.
Elec. Serv. Co. v. Graves, 488 S.W.2d 135, 139 (Tex. Civ. App.—El Paso
1972, writ ref’d n.r.e.); City of Sherman
v. Wayne, 266 S.W.3d 34, 46 (Tex. App.—Dallas 2008, no pet.).  It is “defined as the price the property
would bring when offered for sale by one who desires to sell but is not obliged
to do so and bought by one who desires to buy but is under no necessity to do
so.”  Home & Hearth Sugarland, 215 S.W.3d at
511 (citing Sharboneau, 48 S.W.3d at
182, 189).  This is called the “willing
seller -- willing buyer test,” which necessarily takes into consideration all
factors “that would reasonably be given weight in negotiations between a seller
and buyer.”  Id. at 512 (citing City of
Austin v. Cannizzo, 153 Tex. 324, 267 S.W.2d 808, 814 (1954)).  Where appropriate, lost profits to the
condemnee as a result of the taking may also be considered.  Wayne,
266 S.W.3d at 45.  

            Because
a jury can consider “all uses for which the property is reasonably adaptable and for which it is (or in all reasonable
probability will become) available within the foreseeable future” in determining market value, a condemnee is
entitled to present the property’s highest and best use.  Home
& Hearth Sugarland, 215 S.W.3d at 511 (emphasis added); Bauer v. Lavaca-Navidad River Auth., 704
S.W.2d 107, 109, 112 (Tex. App.––Corpus Christi 1985, writ ref’d n.r.e.) (on
property containing established pipeline corridor, highest and best possible
use of severed condemned land was for sale of pipeline easements).  Consideration of the highest and best use “cannot
be given to uses which are purely speculative and unavailable.”  Home
& Hearth Sugarland, 215 S.W.3d at 511 (citing Cannizzo, 267 S.W.2d at 814). 
Thus, factors used in the analysis include legal permissibility,
physical possibility, financial feasibility, and maximum productivity.  Id.  “The existing use of the land . . .
is its presumed highest and best use, but the landowner can rebut this
presumption by showing”:  “1. That the
property is adaptable to the other use.  2. That the other use is reasonably probable
within the immediate future, or within a reasonable time.” and “3. That the
market value of the land has been enhanced thereby.”  Zwahr,
88 S.W.3d at 628; Cannizzo, 267
S.W.2d at 814.  

            “Texas
law permits landowners to introduce testimony that the condemned land is a
self-sufficient separate economic unit, independent from the remainder of the
parent tract with a different highest and best use and different value from the
remaining land.”  Zwahr, 88 S.W.3d at 628 (citing
Bauer, 704 S.W.2d at 109); see also
Cannizzo, 267 S.W.2d at 814.  When
this occurs, the fair market value of the severed land can be independently
assessed without consideration of the remainder.  Zwahr,
88 S.W.3d at 628.

            Once
determined, the highest and best use of the property is then taken into
consideration when conducting the appraisal. 
Texas courts have approved three methods of appraisal.  The first, and most preferred, is the
comparable sales method.  Home & Hearth Sugarland, 215 S.W.3d
at 512 (citing Sharboneau, 48 S.W.3d
at 182).  This method compares the values
of similar properties in nearby locations. 
Rice, 96 S.W.3d at 647.  It is typically “the most applicable method
of valuing single-family houses, townhouses and condominiums.”  Id.  Courts look to the replacement cost and income
approach when comparable sales are not available.  Home
& Hearth Sugarland, 215
S.W.3d at 515; see also Cherokee Water
Co. v. Gregg Co. Appraisal Dist., 773 S.W.2d 949, 955 (Tex. App.—Tyler
1989), aff’d, 801 S.W.2d 872 (Tex.
1990).  

            Where
“improved property . . . is unique in character and not frequently exchanged in
the marketplace,” appraisers can utilize the cost approach, which determines
the current cost of replacing the improved property.  Home
& Hearth Sugarland, 215 S.W.3d at 515; Rice, 96 S.W.3d at 647.  “After
estimating the cost of building the structures on a property, and deducting an
amount for depreciation, the appraiser adds the estimated value of the land and
arrives at an indication of value.”  Rice, 96 S.W.3d at 647.  This type of appraisal is normally conducted
when valuing a building and the land on which it sits. 

            Where
“the property, in the open market, would be priced according to the income it
already generates,” the income approach is appropriate.  Home
& Hearth Sugarland, 215
S.W.3d at 515 (citing Sharboneau, 48 S.W.3d at 183).  “By estimating this future income and
applying a capitalization rate, the income approach allows the appraiser to
arrive at a present value for the income-producing property.”  Sharboneau,
48 S.W.3d at 183.  This valuation method
is ideal for rental properties.  “No
matter which appraisal method an expert uses, the goal is always to find the
fair market value of the condemned property.” 
Home & Hearth Sugarland, 215 S.W.3d at
515.   

            Certain
principles apply to all methods of valuation. 
Because value is determined at the time of the taking, “[t]he fact that
previous improvements have been made by the condemnor or others is a factor
which it is proper to consider.”  McChristy, 140 S.W.2d at 577; Ware, 86 S.W.3d at 822–23 (“[W]here the
property is under a lease to a third party, the valuation of the various estates
or leasehold interest is usually determined by ascertaining the market value of
the property with the improvements thereon as though owned exclusively by one
party.”).  This ensures the condemnee
receives the current value of the property. 


            However,
with respect only to the condemned land, the project enhancement rule generally
“provides that the factfinder may not consider any enhancement to the value of
the landowner’s property that results from the taking itself,” to avoid placing
the landowner “in a better position than he would have enjoyed had there been
no condemnation.”  Zwahr, 88 S.W.3d at 627–28 (citing Corbin, 504 S.W.2d at 830–31). 
This rule is in accordance with the concept that “[v]alue to the taker
is not the proper guide” and avoids a windfall to the condemnee.  Id. at
631 (citing Graves, 488 S.W.2d at
138).    

            An
exception to the project enhancement rule applies where a condemnor does not
manifest intent to condemn a strip of land, but condemns nearby properties and
improves them.  City of Dallas v. Shackelford, 145 Tex. 528, 199 S.W.2d 503, 505–06
(1947); see also Corbin, 504 S.W.2d
at 832.  In such a case, by the time the
condemnor decides to condemn the strip of land, its value may have potentially
increased due to the improvements made by the condemnor on nearby
properties.  See Shackelford, 199 S.W.2d at 505–06; Uehlinger v. State, 387 S.W.2d 427, 432 (Tex. Civ. App.—Corpus
Christi 1965, writ ref’d n.r.e.).  Because, at the time of the taking, the
price paid by a willing buyer would take into account the nearby improvements,
a landowner would have to be compensated by the condemnor for the increased
value of his or her property.  In other
words, the “project” in this scenario was the new, previously unannounced
project, not the old, previously existing, ongoing projects.  Thus, because the rule prohibits project
enhancement, only consideration of the new “project” is prohibited.  

            The
basic rules can be summarized in the following fashion:

1)         the
fair-market value of the land is measured at the time of taking; 

2)         the goal is to assess what value a
knowledgeable willing seller-willing buyer would place on the property;

3)         the highest and best use must be a use
for which the property is reasonably adaptable
and for which it is (or in all reasonable probability will become) available
within the foreseeable future; 

4)         previous improvements, not a part of
the “project” can be considered if they would be considered by a willing buyer
or willing seller; 

5)         any enhancement to the value of the
landowner’s property that results from the taking itself, i.e., the “project”
cannot be considered; and  

6)         the
property must be valued using an accepted valuation method.

 

            With
these concepts in mind, we review the experts’ testimony.   

            C.        Bolton’s Opinions 

                        1.         Bolton Considered
Niemiec’s Opinions 

            AV
presented two expert witnesses, Niemiec and Bolton.  Niemiec had expertise in the natural gas
processing industry, having been president of Union Pacific Fuels, which owned
seventeen processing plants.  His
experience included analyzing the economics associated with natural gas
processing plants.  Bolton was a real
estate appraiser.  Pipeline moved to
exclude their testimony as unreliable and irrelevant under the Daubert/Robinson standard; the trial
court overruled the motion.[11]  Although Pipeline does not complain of the
trial court’s ruling with regard to Niemiec on appeal, Bolton relied upon
Niemiec’s testimony in rendering his expert opinion.  Therefore, an understanding of Niemiec’s
opinions is necessary in order to comprehend Bolton’s valuation of the
land.  

            Niemiec
emphasized that the property was unique due to the gas processing plant, the
characteristics of the land, and the type of lease that existed prior to the
taking.  A gas processing plant cannot
feasibly operate if it is built on a tract of land without access to pipelines
to distribute the gas, proper permitting to authorize the operation, reasonably
nearby gas production anticipated for a lengthy duration, and the proper amount
of electrical supply.  The subject tract
of land has all of the necessary infrastructure and characteristics as a result
of the operation of a gas processing plant on this property for more than
thirty years, which enhances the value of this tract and distinguishes it from
another nearby vacant tract of rural real estate.  

            Niemiec
testified that buyers and sellers for this tract of land need to know the
details about the prospect for gas production in the area, the details about
the pipelines entering it, whether the site was permitted, and whether it had
outlets for its product.  A knowledgeable
landowner would need to know all of the factors associated with the lease, the
costs to move, the expiration conditions of the lease, and other parties that
might be interested in leasing or buying the land.  He then discussed many of those factors—in
particular, the history of this lease and the unusual content of the most
recent lease which allowed a reversion of the real estate to the landowners
without an option to renew the lease. 
Niemiec explained that because this lease expired prior to the taking,
the tenant (Processing) had the option to shut down the plant and acquire
another site, move or build another plant, sell to another party, or continue
to negotiate with the landowner. 

            As
an expert in the gas processing industry, Niemiec testified that he evaluated
the cost of moving and building a new plant to be $52 million without
considering land costs and permits.  The
old plant could be sold for salvage for $14 million, leaving a net cost of
moving at $38 million.  Instead of
moving, the tenant could build a temporary plant which would partially process
the gas and allow it to meet pipeline specifications.  This would involve disassembling the old
plant and moving to the other site at a net cost of $29 million.  If the property had the improvements removed,
which Pipeline had a right to do, and we do not speculate as to what action it
would take, Niemiec testified that other companies would be interested in this
real estate, and for approximately $74 million ($22 million for the land and
$52 million for the plant) it would own a property and improvements that were
valued at between $165 and $231 million and would generate income of $16.5
million per year.  Thus, many buyers
would be interested in this site.[12]  Niemiec testified that a willing investor
would pay from $18 to $22 million for the land, knowing the lease had expired
and what would have to be done to move the plant.  

                        2.         Fair
Market Value at the Time of Taking 

            Bolton stated that
he measured the fair market value of the land as of the date of the taking,
which both parties stipulated was April 7, 2004.  On that date, the lease had expired, the
property was already improved by the gas processing plant, had a permit to
operate, and was benefitted by fifteen or sixteen pipelines, each with its own
easement.[13]  

                        3.         Willing
Buyer-Willing Seller 

            Bolton utilized Neimiec’s research
in addressing the willing buyer-willing seller test.  Bolton began with attempting to find
comparable sales and agreed that the tract was unique.  Bolton also appraised the property using two
income analysis approaches.  He testified
that to find land to substitute or be equivalent to this site would require an
expenditure of $38 million, plus the cost of the land.  Bolton stated that the land provided a cost
savings to a willing buyer since going to a new site would involve finding one with
pipelines entering, obtaining permits, and doing title work.  “Then you would have to build a plant that --
of $52 million.”  Bolton shared Neimiec’s
opinion that this location was unique because it was already permitted, had 138
KB power provided, was in the middle of a gas field, had fifteen or sixteen
pipelines attached, and the market was not declining.  If the plant was removed by the tenant, and
the purchase of the land by a new buyer did not include the plant, the buyer
would still save a lot of money because the land housed the pipelines that
would allow the site to control most of the natural gas processing
business.  On the other hand, if the
tenant decided not to remove the plant because building a new site would cost
more than $50 million, and sold the existing plant for salvage value, the buyer
would save $38 million since buying the salvage of the existing plant would
cost $14 million.  

                        4.         Highest
and Best Use Took Into Consideration Previous Improvements 

            Bolton
determined that the land’s highest and best use was for an industrial gas
processing plant and that the active market included gas processors.  Because the land had been adapted and used in
that manner for over thirty years, this highest and best use was
foreseeable.  In establishing the highest
and best use of the property and appraising the real estate, Bolton took into
consideration the fact that a gas processing plant had been established for
many years and that fifteen or sixteen pipelines were connected to the
property.  Pipeline’s expert agreed the
land was a good site for a gas processing plant.  

                        5.         Methodology


            Bolton
first appraised the real estate using the comparable sales approach.  There was not much dispute that the
attributes of this real estate caused it to be one of a kind.  Because of this uniqueness, the use of
traditional comparable sales comparisons procedure was a challenging task.  Bolton used the traditional approach in
attempting to find other industrial real estate sites.  Bolton testified that he reviewed the
differences in the uses, locations, and market conditions between the subject
property and comparable tracts, and adjusted for the unique feature of this
tract “having the pipelines, the lease and the tenant improvements and the
unique location of the 23.79 acres.” Based on the comparable sales approach,
Bolton appraised the 23.79 acres at $20,955,000.00.  Pipeline’s expert appraiser, Donnie Sherwood,
said he had no criticisms about Bolton’s methodology and possessed no
information to dispute the figures.  

            Considering
Niemiec’s findings, Bolton also used the income approach to “analyze[] what a
prudent and knowledgeable investor would pay for the leased land, which includes
the terms of the Lease Agreement, considering the gas processing facility must
be removed and the land restored, within a six month period.”  Bolton explained: 

[W]e take or analyze the amount of income the
property can produce, subtract the expenses that are necessary to produce that
income, and then we do a calculation called capitalization, and this is, we use
a typical rate of return for that type of property to convert it to value . . .
analyz[ing] such comparable rental data as are available. 

 

This discounted cash flow
analysis considered a three-year hypothetical lease, with nominal annual rents
paid at the beginning of each year, followed by a reversion of the land at the
end of the third year.  The rental
amounts for years one through three were discounted to present value (based on
the date of taking), with the value of the discounted reversions added.  The reversionary interest in this instance
was the major value.  Using this
analysis, Bolton found the market value of the subject tract as $18.9 million. 

            A
third method of appraisal by Bolton was the direct capitalization approach,
which is based on one year’s estimated net operating income derived from a
market land lease rate.  The annual lease
payment would be based on the cost savings to be realized by the plant owner if
a long-term lease could be entered. 
Those costs range from $20 million, plus business disruption to $29 million
to $38 million to avoid much of the business disruption.  Land lease rates of return for industrial
sites range from 4.8 percent to 10.63 percent. 
Based on these rates, a reasonable market rental rate of $1.8 million
per year to $2.3 million per year would be yielded.  Capitalizing the annual net operating income
using a capitalization rate of 8.0 percent results in a value to the economic
unit including the lease agreement terms as of April 7, 2004, of
$22,275,000.00.  

            D.        Pipeline’s Complaints 

            Pipeline argues
that Bolton’s appraisal improperly:  (1)
included value of improvements to the property; (2) analyzed the land’s value
to Pipeline; (3) included project influence; (4) violated the undivided
fee rule; (5) improperly considered Processing’s business revenues; and (6)
improperly relied on incomparable sales data. 


                        1.         Value
of Improvements Until Time of Taking Can Be Considered

            The
record and caselaw demonstrate that AV was entitled to consider the effect of
improvements when determining the fair market value of the condemned land.  Contrary to Pipeline’s assertions, the
experts clarified they did not consider value to Pipeline, but that knowledge
of the value of the unique nature of the property was taken into consideration
in determining the fair market value between a willing seller and willing
buyer, which in this case would most likely be another natural gas pipeline
company.  Rule 1-2(e) of USPAP rules
provides:  

In developing a real property appraisal, an
appraiser must: . . . (e) identify the characteristics of the property that are
relevant to the type and definition of value and intended use of the appraisal,
including:  (i) its location and
physical, legal, and economic attributes; . . . (iii) any personal property,
trade fixtures, or intangible items that are not real property but are included
in the appraisal; (iv) any known easements, restrictions, encumbrances,
leases . . . .

 

http://www.uspap.org/2010USPAP/USPAP/stds/sr1_2.htm.
 Also, Rule 1-4(g) makes clear, “When
personal property, trade fixtures, or intangible items are included in the
appraisal, the appraiser must analyze the effect on value of such non-real
property items.”  http://www.uspap.org/2010USPAP/USPAP/stds/sr1_4.htm.

            To
assess what effect the improvements had on the land value, Bolton relied upon
Niemiec’s calculations recited above. 
Niemiec’s focus was on potential buyers who would be interested in the
cost savings provided by the unique situation of the expiration of the lease
which occurred prior to the date of the taking. 
Niemiec reasoned:

Someone coming in, looking at the situation with
the lease expired would look at this and say, “It’s a great site; I could
purchase the lease from the landlord,” and then the tenant, any tenant, or in
this case, [Processing], would have a choice to either negotiate now with the
new owner of the lease, . . . or they would simply continue on and move their
-- remove their site, remove their improvements, their plant from this site per
the lease.

 

“The pipelines out of the plant
are pipelines that would be able to be utilized by any third party.  And the gathering system contracts would
allow the producer to move the gas to the plant site.”  The savings advantage to the potential buyer
could also be used to negotiate a higher rent from AV’s standpoint.  According to Niemiec, “knowing what I know
about the site and the lease, . . . [a potential buyer] would be willing to put
up a minimum of $18 million for the” surface land because “the pipeline is
coming in; the pipeline is going out; the air permits; the electrical power
that’s there; the customers are all still there.”  He also testified the land was worth that
much because it “has been prepared, and it has the infrastructure to handle all
of these incoming and outgoing pipes.” 
Even if the investors paid $22 million for the real estate, a new plant
could be built on this site that is already permitted and has the incoming
pipelines for $50 million, resulting in a total investment of $72 million to
acquire a plant worth between $165 million and $231 million.

            We find that to
properly appraise this real estate, one cannot ignore the fact that a gas
processing plant is and has been established on it for more than thirty
years.  It is true that this is an
extremely unusual situation (that a major processing plant is built on real
estate on which the lease has expired with no option to renew), but the
appraisers and this Court must acknowledge the existing facts; it is not
improper to consider any effect the improvements and the expiring lease have on
the value of the underlying real estate. 


                        2.         Bolton
Did Not Use Value to the Taker

            Bolton
testified that he did not assess value to Pipeline and that if he had, AV would
have asked for more since the plant and land together were valued between $165
million and $231 million. 

            Pipeline
complains “Bolton plays upon the land’s special
value to Enbridge by asserting there would be a ‘free-market’ to buy the
surface of land and resell it to Enbridge at a hold–up price.”  We find nothing in the record to support the
notion that Bolton’s analysis envisions attempting to resell the land to
Pipeline.  

            Next,
Pipeline argues that Bolton’s testimony violated the “first” kind of project
influence by considering the special value of AV’s land to Pipeline’s public
project.  In doing so, Pipeline argues
that Bolton considered Pipeline’s costs and profits in operating the plant and
speculated about its business decisions. 
Pipeline also argues that AV is attempting to recover the costs to
Pipeline, rather than the fair market value through Bolton’s reliance on
possible costs to move the plant to another location.  Pipeline complains Bolton erroneously
includes testimony of “cost savings” or what Pipeline refers to as “opportunity
cost.”  This is an argument that Bolton
assessed value to the taker. 

            In
support of its argument, Pipeline cites Northwest
Pipeline Corp. v. 95.02 Acres of Land, more or less, in Power County, Idaho,
No. CV-01-628-E-BLW, 2003 WL 25768634 (D. Idaho Dec. 19, 2003) (mem. op. & order).  Even if this case (an unpublished federal
district court ruling on a motion in limine) had precedential value, it is far
different from the case at hand.  In Northwest Pipeline, the pipeline company
condemned property on an Indian reservation which already had an easement.  The offer of proof was the alternative cost
of rerouting the pipeline hundreds of miles completely off the
reservation.  The district court properly
found that such alternative cost was not a measure of the market value of the real
estate.  

            In
Northwest Pipeline, the evidence of
the cost of placing a pipeline completely off the Indian reservation had no
relation or bearing on the market value of the property.  By contrast, the evidence of cost here
related to a determination of the market value of the real estate upon which a
gas processing plant has been operational for many years.  Both Bolton and Niemiec testified to costs of
moving and building a new plant, but we understand that evidence was presented
in an effort to display what a willing, knowledgeable buyer would pay for the
land.  Such testimony is relevant in
considering the financial feasibility of a property, the highest and best use
of the property, as well as an appraisal of what a knowledgeable buyer would
pay.  The experts identified more than
sixteen other potential buyers in this market, including many other gas
companies that have direct ties to the East Texas oil field, as well over sixty
gas pipeline companies.  

            Pipeline
urges it is unfair that a condemnor be required to pay the enhanced price which
its demand alone has created.  It
complains that AV is attempting to obtain a special value to the condemnor as
distinguished from others who may or may not have the power of eminent
domain.  United States v. Cors, 337 U.S. 325 (1949).  Pipeline cites cases in which the same
government entity condemning the property was asked to pay for a leasehold,
easement, or other right which it owned prior to condemnation, on the basis
that the continued revenue was expected.  However, in these cases, there was no evidence
that there was a market which would be available to purchase to the
interest.  Rather, the condemnor either
created demand for the property or was the sole market for the property.  Thus, these cases did not allow evidence of
the owner’s special need in the property. 
Id. at 333 (government should not have to pay enhanced value for tug boat
in time of war where market prices were inflated for war vessels due to
government’s need for them during war time);
United States v. Weyerhaeuser Co., 538 F.2d 1363, 1366 (9th Cir. 1976) (company
not entitled to payments for use of road owned by private company leading to
federal timberland where government had exclusive licenses to use road prior to
condemnation); see also Graves, 488
S.W.2d at 136–38 (condemnor’s cost to construct future transmission line
irrelevant to fair market value of easement for electrical transmission line on
date of taking).  

            Here,
the action of Pipeline in condemning this property did not create a special
need demand for the real estate; that market had been created by years of use
of the real estate as a gas processing plant. 
For thirty years, other companies constructed the improvements and used
this property for gas processing.  The
evidence shows there is a large demand for natural gas which must be processed
before entering the pipelines for delivery to consumers.  Many companies are profitably conducting such
business.  While the unique circumstances
of this lease expiration may have presented a rare opportunity for competing
companies to attempt to acquire this real estate, the value of the real estate
is not a result of the condemnation and does not depend on Pipeline either
continuing operation or removing its property. 


            Our
conclusion was supported many years ago, when the Supreme Court of the United
States addressed an analogous situation in Boom
Co. v. Patterson, 98 U.S. 403 (1878). 
In earlier days, the rivers, especially the Mississippi River, served as
major transportation avenues for commercial goods.  Logging was an industry that apparently
relied on the Mississippi River for transportation to the market.  Patterson owned three islands located in the
Mississippi River, enabling him to construct a boom (a series of chains or
cables, or timbers to confine floating timber) attached to the west bank of the
river capable of holding over twenty million feet of logs.  This added great value to the three
islands.  Id. at 408.  The condemning
authority also planned to use the three islands as a boom; it argued that the
adaptability of this land for use as a boom should not be considered since only
the Boom Company was authorized to receive and manage timber on the Mississippi
River.  The Supreme Court found that such
authority did not apply to timbers of parties “choosing to keep the control and
management of them in their own hands.”  Id. at 409.  Consequently, the three islands were valuable
for use as a boom, not only to the condemning authority, but also to other
parties; therefore, the property could properly be evaluated to include that
enhanced value.  

            While
we recognize the difference in this case is that AV owns only the real estate
and not the improvements, the reasoning of the Boom Co. case concerning the value to the taker argument is
applicable.  The value of this real
estate as a gas processing plant site is not exclusive to Pipeline.  Therefore, Bolton’s assessment was of the
fair market value, not the value to the taker. 


                        3.         Bolton
Did Not Violate the Project Influence Rule

            Bolton
testified he did not take into consideration the effect of the condemnation
proceeding, negating Pipeline’s application of the project influence rule.  Pipeline did not manifest intention to
condemn the property until the March 10 letter. 
Therefore, because there was no further Pipeline “project,” Bolton
concluded the project enhancement rule did not apply, and he took into
consideration, in accordance with Rule 1-2(e), the fact that the land housed a
multi-million dollar plant and was subject to the pipeline easements.  He assumed, because it would be financially
unfeasible for Pipeline to remove the gas processing plant,[14]
that it would renew the lease, or that another company would lease the
site.  He based his opinion on what the
annual market rent lease payment would be, taking into account cost savings
that a potential plant owner would realize on a long-term lease.  Bolton appraised the surface interest in the
23.79 acres as $20,955,000.00.  Bolton
made clear that while the improvements were taken into consideration, he did
not actually appraise them; rather, he considered the improvement values to aid
his conclusion in determining the fair market value of the surface land
underneath them.  

a.         Pipeline
Built No Improvements; Therefore, Consideration of the Processing Facility Does
Not Violate Project Enhancement Rule 

 

            Pipeline
cites many cases, both federal and state, with respect to the issue of project
influence.  Some of the cases are
distinguishable because they involve fact patterns in which the condemnor built
projects in surrounding areas while indicating intent to condemn the subject
property.  Corbin, 504 S.W.2d at 831 (“enhancement is allowed up to the time
that the condemnor manifests a definite purpose to take the particular land”).  Here, the landowners could only include
previously built projects when assessing the fair market value of their
property on the date of the taking if they existed before the condemnor
manifested desire to condemn.  Shackelford, 199 S.W.2d at 505–06
(concluding “it was entirely proper for the jury to take into consideration [the
property’s] enhanced value [from existing public marketplace project]” “in view
of the fact that there was no definite purpose manifested by the City to take
[the subject property]” until later). 
Here, the condemnor, Pipeline, did not build any improvements.  Therefore, these cases are not
controlling.  

b.         AV
Is Not Seeking Value of Processing Facility:  This Is Not a Fixtures Case

 

            Other
cited cases all contained a common, distinguishable fact pattern where a
condemnor, under a lease or otherwise, built improvements for which the landowner
sought compensation.  Etalook v. Exxon Pipeline Co., 831 F.2d
1440 (9th Cir. 1987); United States v.
Delaware, L. & W.R. Co., 264 F.2d 112 (3rd Cir. 1959); Anderson-Tully Co. v. United States,
189 F.2d 192 (5th Cir. 1951); Old
Dominion Land Co. v. United States, 296 F. 20 (4th Cir. 1924).   

                                    i.
         Anderson-Tully

            Pipeline
relies most on Anderson-Tully, but
the analysis of that case distinguishes all the above-cited cases.  In Anderson-Tully,
the government leased property and built a piling structure thereon.  The lease required improvements to be removed
at the end of the lease term.  Id. at 194–95.  After expiration of the lease, the government
decided to condemn the property. 
However, in Anderson-Tully,
the landowner claimed that the law of fixtures and contract converted the
piling structure to realty which should have been included in the award for
just compensation.  Id. at 196.  The landowner
sought to introduce evidence of the cost of replacing the condemned area.  The court in Anderson-Tully pointed out that 

the character of the evidence sought to be adduced
was not “reproduction” evidence in the usual sense, that is relating to the
cost of reproducing structures or other improvements to the land, but was
evidence as to the estimated cost which would be incurred if someone wished to
fill and otherwise improve an adjacent tract of land in order to make it
physically identical to the land taken.  

 

Id. at 195.  Here, AV never
sought to introduce evidence of the cost to obtain easements and install
pipelines, proper power lines, etc., to make another tract physically
identical, but since the highest and best use of the property was for a gas
processing plant, evidence of the cost of the plant to a third party that might
buy the real estate was relevant and altogether different from the type of
evidence sought to be presented in Anderson-Tully.  

                                    ii.         United States v. Delaware, L. &
W.R. Co. 

            Pipeline
relies heavily on United States v.
Delaware, L. & W.R. Co., 264 F.2d 112. 
There, the railway company owned land that was leased to Hoffman
Machinery for fifteen months during the Korean War, which was used to
manufacture large caliber shells. 
Hoffman had a contract with the government that included reimbursement
for improvements placed on the property which enhanced its value by $250,000.00
to $300,000.00.  All improvements were
paid for by the government.  The
government began condemnation proceedings in August 1954.  Delaware L.W.R. argued that it should receive
the enhanced value of the property.  In
other words, the government would be required to pay the railway for the
enhanced value of the property after it had paid for the installation of the
improvements giving rise to the enhancement. 
The lease between Hoffman and the railway allowed it to remove all
improvements at the lease expiration. 
First, the court held that whether the lessee would have actually
removed the improvements was not relevant; rather, the issue was what the
reversioner was entitled to at the end of the term.  The court further held that the government
was placed in the position of the lessee by reason of its contract to indemnify
Hoffman for the costs of improvements. 
Even if the improvements were considered fixtures attached to the realty,
special considerations in a condemnation case are present when the government
caused the improvements to be made originally. 
The court held that the fixtures law has no application in such a
situation.  

            The
most obvious differences with Delaware, L.
& W.R. are:  (1) the landowner
was asking the government to pay the enhanced value even though the government
had originally installed all improvements, whereas here the enhancement was
from prior private tenants as well as third parties adding the adjacent
pipelines which fed gas to the plant; and (2) the issue of fixtures is not
involved in this case.  

            We
agree with the Delaware, L. & W.R.
opinion that the relevant issue is not the cost that might be incurred by
Pipeline by removing the entire structure or taking other measures.  The issue is the value of the real estate
that reverts to AV after Pipeline either removes all the property or attempts
some other measures.

                                    iii.        Pipeline’s Other Cited Cases Do Not Apply

            The last category of cited cases does
not apply.[15]  United
States ex rel. and for Use of Tenn. Valley Auth. v. Powelson, 319 U.S. 266
(1943) (landowner cannot recover consequential damages of lost business
earnings as result of condemnation); Tex.
Elec. Serv. Co. v. Lineberry, 162 Tex. 570, 349 S.W.2d 105 (1961) (expert
improperly used capitalization appraisal approach to value sale of easement
where there was no evidence it was previously an income-generating property); Tex. & New Orleans Ry. Co. v. Sutor,
56 Tex. 496 (1882) (trespass to try title suit finding landowner who permits
railroad company to build roads on land without charge on condition that
ditches be constructed to carry off water cannot declare right-of-way forfeited
for failure to meet conditions after seventeen years); McAshan v. Delhi Gas Pipeline Corp., 739 S.W.2d 130 (Tex. App.—San
Antonio 1987, no writ) (where land’s current use was for ranchland at time of
taking, evidence that property would be ideal for compressor site, and
valuation thereon was irrelevant).  

            In
this case, AV agrees that the processing plant belongs to Pipeline and is not
seeking compensation for this improvement. 
Here, the cost testimony related to the amount a purchaser of the real
estate would expect to spend to build another gas plant if Pipeline removed
it.  The relevance of this testimony was
to show that another gas processor could spend $52 million to rebuild a new
plant on the property, buy the real estate for $22 million which already had
all the infrastructure needed for gas processing, and result in a savings to
the potential purchaser, who would then own an entire gas processing facility
worth $165 to $231 million.  Because
Bolton did not take into consideration the effect of the condemnation
proceeding, he did not violate the project influence rule.  

                        4.         The
Undivided Fee Rule Does Not Apply

            Pipeline
claims Bolton’s testimony violated the undivided fee rule.  The rule is simple:  Where there is more than one interest in a
property, i.e., a fee interest and a leasehold, both the fee holder and
leaseholder are entitled to compensation. 
The fair market value of the property as a whole with improvements must
first be assessed and then divided according to the respective interests.  In other words, the value given to both the
fee holder and interest holder when aggregated cannot exceed the fair market
value of the property.  Ware, 86 S.W.3d at 822–23.[16]  Again, this rule ensures no party receives a
windfall.  At the time this property was
taken, the lease had expired and the lessee’s remaining right or duty was to
remove the improvements within six months. 
We find that the undivided fee rule does not apply.[17]  The only party entitled to compensation was
AV, as Processing’s right to use the property had expired prior to
condemnation.  

                        5.         Bolton
Did Not Consider Pipeline’s Business Revenues

            Pipeline
next argues that Bolton’s decision to value the property’s highest best use as
a natural gas processing plant, taking into consideration Pipeline’s business
revenues, violated the value to the taker rule. 
Pipeline relies on State v.
Central Expressway Sign Associates, in which the State condemned Central’s
billboard easement leased to a third party. 
302 S.W.3d 866, 869 (Tex. 2009). 
There, the trial court excluded the expert’s valuation testimony since
he did not take the lessee’s business revenue into consideration.  The Texas Supreme Court found that to be
error.  Id.  In Central Expressway Sign, the State had settled its condemnation
suit against the lessee by paying just compensation in the form of relocation
benefits.  Id.  In other words, because
the only interest that had to be valued was the lessor’s interest, and the
lessor did not have any interest in the lessee’s lost profits, evidence of the
lessee’s business revenues was irrelevant. 
Here, there is no evidence in the record that Bolton relied on Pipeline’s
business revenues.  Instead, Bolton
estimated cost savings to a potential purchaser of the land in order to
calculate the financial feasibility factor to determine the property’s highest
and best use in evaluating fair market value. 
Pipeline’s expert Sherwood agreed that an appraiser may adjust for cost
savings to a potential buyer when considering land value.  

                        6.         Bolton’s
Comparable Sales Data

            Finally, Pipeline
contends Bolton improperly relied on incomparable sales data.  Bolton examined land sales of industrial
sites in several Texas counties between September 2002 and April 2006.  In his expert report, Bolton lists six
comparable sales transactions involving industrial tracts.  The sales prices were in a range from
$5,500.00 to $21,905.00 per acre.  There
was evidence that for any company to build an equivalent plant, it would incur
a cost of $52 million.  However, a plant
cannot feasibly operate if it is built on a tract of land without access to
pipelines to distribute the gas, proper permitting to authorize the operation,
reasonably nearby gas production anticipated for a lengthy duration, and the
proper amount of electrical supply.  The
subject tract of land has all of the necessary infrastructure and
characteristics as a result of the operation of a gas processing plant on this
property for more than thirty years, which enhances the value of this tract and
distinguishes it from another nearby vacant tract of rural real estate.  Niemiec’s testimony was that a willing buyer,
understanding these facts, would invest $18 to $22 million for this real
estate.  If the property had the
improvements removed, which Pipeline had a duty to do, and we do not speculate
as to what action it would take, Niemiec testified that other companies would
be interested in this real estate, and for approximately $74 million ($22 million
for the land and $52 million for the plant) it would own a property and
improvements that were valued at between $165 and $231 million and would
generate income of $16.5 million per year. 
We believe it was proper to consider this evidence and make adjustments
in appraising the real estate.   

7.         Trial
Court Did Not Err in Denying Pipeline’s Motion to Strike Bolton’s Testimony

 

            In
summary, Bolton assessed the fair-market value of the land based on the willing
seller-willing buyer test as of the stipulated date of the taking.  His assessment of the land’s highest and best
use as a gas processing facility was the reasonable and foreseeable presumed
highest and best use.  Because the gas
processing facility, pipeline easements, and other improvements were in place
prior to the date of the taking, Bolton determined their impact on the fair
market value of the land, since such assessments would be considered by a
willing buyer.  There were no
enhancements in value resulting from the actual condemnation, and value to the
taker was not utilized.  Finally, Bolton
utilized the accepted income approach valuation method, yielding a figure using
a methodology unchallenged by Pipeline’s experts.  Based on the record and precedent before us,
we conclude that the trial court did not abuse its discretion in finding Bolton’s
testimony regarding market value relevant, reliable, and thus, admissible.  Pipeline’s first point of error is
overruled.  

            E.        Application
to Pipeline’s Expert, Albert Allen

            Allen determined
that the condemned land’s highest and best use was for rural residential
purposes.  He stated in his deposition
that he did not analyze any other use. 
Further, Allen admitted that he did not take into consideration any
pipelines, easements, permits, etc., because he was told to value the land as
vacant.  Allen’s fair market value for
the property was $47,940.00. 

            AV
objected to the inclusion of Allen’s testimony on the grounds, among others,
that he:  (1) used an incorrect highest
and best use for the property; (2) failed to analyze the income approach; (3)
assumed the property was barren, and did not take into consideration the effect
of improvements listed under USPAP Rules 1-2 and 1-4.  Essentially, AV complained that Allen valued
the property as it existed in 1973.  

            “The
existing use of the land . . . is its presumed highest and best use.”  Zwahr,
88 S.W.3d at 628.  Pipeline argues that a
jury may decide between two highest and best uses.  While true, in order to be considered as a
relevant highest and best use, use of the property as rural residential must be
reasonably adaptable within the
foreseeable future.  Wayne,
266 S.W.3d at 45; Bauer, 704 S.W.2d
at 109, 112 (on property containing established pipeline corridor, highest and
best possible use of severed condemned land was for sale of pipeline
easements).  Pipeline was required to
meet the burden to defeat the presumption that the current use was the best use
by showing it was legally permitted, physically possible, and financially
feasible for the property to be considered rural residential and that such
classification would yield maximum productivity.  Zwahr,
88 S.W.3d at 628.  

            The
property has been granted permits to operate as a natural gas facility.  There is no evidence indicating that the
23.79 acres would be classified as residential property in the foreseeable
future.  Bolton testified that
residential properties could not be built where the pipelines existed due to
the pipeline easements.  Use of property
for residential purposes would likely not be legally permitted.  Nevertheless, Allen’s “conclusions assume[d]
that a zoning change would be likely.”[18]  In order to prepare the site for residential
use, the existing gas plant would have to be torn down and the property
prepared for multiple housing.  Allen did
not explain why the existing use of the property would not continue as the
highest and best use, did not explain why he overlooked the thirty-year history
of that use, and did not consider the effects of the easements or how building
residential units was financially feasible. 
The trial court found Allen’s opinion attempted to “create [a] total
fiction, appraisal in a vacuum.”  While
use as residential property could theoretically be physically possible, it
would not be financially feasible. 
Consideration of the highest and best use “cannot be given to uses which
are purely speculative and unavailable.” 
Home & Hearth Sugarland,
215 S.W.3d at 511 (citing Cannizzo,
267 S.W.2d at 814).  

            “Unless
an appraisal gives a value based on the land’s condition at the time of
condemnation -- taking into account all relevant factors that affect its
valuation, including the market for its possible future use -- it is not
relevant to the issue of market value.”  Sharboneau, 48 S.W.3d at 185.  Not only did Allen fail to explain why the
existing use of the property would not be presumed as the highest and best use,
his opinion did not offer fair market value of the land based on its condition
at the time of the condemnation and did not account for all relevant factors
affecting valuation.  The trial court was
within its discretion to conclude Allen’s opinion was unreliable.  Zwahr,
88 S.W.3d at 631.  We overrule Pipeline’s
second point of error.  

IV.       PIPELINE WAS NOT
ENTITLED TO DIRECTED VERDICT AND JNOV

            Pipeline’s
arguments with respect to directed verdict and judgment notwithstanding the
verdict are both based on the premise that Bolton’s testimony should have been
excluded.  It argues that absent Bolton’s
testimony, there was no basis for the jury award of $20,955,000.00.  Thus, Pipeline claims that the trial court
should have directed verdict in AV’s favor only in the amount of
$300,000.00.  We have already determined
that the trial court did not err in admitting Bolton’s testimony.  

            The
standard of review for both judgment notwithstanding the verdict and the denial
of a directed verdict is a legal sufficiency or “no evidence” standard of
review.  Mauricio v. Castro, 287 S.W.3d 476, 478 (Tex. App.—Dallas 2009, no
pet.); Home & Hearth Sugarland, 215 S.W.3d at 516
(citing Sherman v. First Nat’l Bank in
Center, Tex., 760 S.W.2d 240, 242 (Tex. 1988)).  In this case, a directed verdict or judgment
notwithstanding the verdict for Pipeline would only be proper if AV failed to
present any evidence raising a fact issue entitling it to recover the fair
market value as assessed.  Prudential Ins. Co. of Am. v. Fin. Review
Servs., Inc., 29 S.W.3d 74, 77 (Tex. 2000). 
We will review the evidence in the light most favorable to the jury’s
finding, crediting favorable evidence if reasonable persons could, and
disregarding contrary evidence unless reasonable persons could not.  City of
Keller v. Wilson, 168 S.W.3d 802, 807 (Tex. 2005); Home & Hearth Sugarland,
215 S.W.3d at 515.

            Aside
from Bolton’s valuation testimony, the jury heard from another industry
expert.  Niemiec had been involved in the
oil and gas industry since the 1970s.  He
graduated from Princeton, attended the advanced management program at Harvard
Business School and Cornell University, worked for Exxon and then Union Pacific
Fuels, eventually becoming the president of that company.  Niemiec’s responsibilities included project
approvals and oversight of seventeen processing plant sales, in which he
acquired the skills to understand the “microeconomics of processing plants.”  He possessed unique skills in evaluating what
a potential natural gas company would consider when purchasing property.  Niemiec’s testimony, which was not challenged
on appeal, was that a willing buyer would pay between $18 million and $22
million for the land only.  Thus, the
trial court did not err in overruling Pipeline’s motions for directed verdict
and judgment notwithstanding the verdict, given this record.  Pipeline’s third point of error is
overruled.  

V.        FAILURE TO PRESERVE
ERROR REGARDING JURY INSTRUCTIONS 

            The entirety of
Pipeline’s argument with respect to this point of error states:

Because the trial court improperly allowed Mr.
Bolton’s conclusions of value over proper objections, the court should have
allowed the jury to be properly instructed on the foregoing legal
principles.  The requested and refused
instructions were submitted to the court prior to the ultimate preparation of
the jury charge and argument to the jury. 
These instructions, reflecting the principles set out above, are part of
the record at CR 7:547-568; App. Ex. 4. 

            Rule
38.1(i) of the Texas Rules of Appellate Procedure requires that a brief contain
“a clear and concise argument for the contentions made, with appropriate
citations to authorities and to the record.” 
Tex. R. App. P.
38.1(i).  Bare assertions of error,
without argument or authority, waive error. 
Bufkin v. Bufkin, 259 S.W.3d
343, 354 (Tex. App.—Dallas 2008, pet. denied); see Fredonia State Bank v. Gen. Am. Life Ins. Co., 881 S.W.2d 279, 284–85 (Tex. 1994) (discussing
“long-standing rule” that point may be waived due to inadequate briefing).  Pipeline fails to cite any authority for this
point of error in its brief.  It does not
discuss why each particular instruction was necessary and proper.  Thus, we conclude Pipeline’s brief is inadequate
with respect to this point of error and presents nothing for review.  We overrule its last point of error. 

VI.       CONCLUSION 

            We affirm the judgment
of the trial court.   

 

 

                                                                        Jack
Carter

                                                                        Justice

 

Date
Submitted:          June 30, 2010

Date
Decided:             October 27, 2010

 











[1]Daubert v. Merrell Dow Pharms., Inc.,
509 U.S. 579 (1993); E.I. duPont de
Nemours & Co. v. Robinson, 923 S.W.2d 549, 556 (Tex. 1995).





[2]Tonkawa
was a private company without the power to condemn. 

 





[3]At
the end of the term, Tonkawa and Roland could agree to the amount of rent for
the next year term, and absent agreement, would arbitrate the amount.  

 





[4]The
parties stipulated that all improvements under the lease belonged to the
lessee.  This stipulation did not include
the pipelines built under easements granted to other companies.  





[5]According
to Niemiec, the Simpsons believed the Tonkawa improvements would be valued at
$1 million.  In fact, they were valued at
$75 million.  

 





[6]Koch
was also a private company without power of condemnation. 

 





[7]Enbridge
Processing was a private company, whereas Enbridge Pipeline is a public company
having the right of eminent domain. 

 





[8]It
is alleged that Processing and AV could not agree on a price for rent when
negotiating the lease renewal.

 





[9]Except
for challenges to experts, the record is clear that “[b]oth parties have agreed
to waive all other issues in this case except for the value and damages caused
by this condemnation,” including Pipeline’s right to the taking. 





[10]Pipeline
accuses Texas courts of “conflating” the rules involving valuation of fair
market value in condemnation cases and states the Texas Supreme Court
“confus[ed] the issues involved.”   





[11]AV
argues that Pipeline waived the point of error that Bolton’s testimony was
unreliable and irrelevant by failing to object to his testimony.  “To preserve a complaint that scientific
evidence is unreliable and thus, no evidence, a party must object to the
evidence before trial or when the evidence is offered.”  Mar.
Overseas Corp. v. Ellis, 971 S.W.2d 402, 409 (Tex. 1998).  Because
Pipeline objected to Bolton’s testimony before trial through a Daubert/Robinson motion to strike his
testimony, and the trial court denied its motion, Pipeline’s point of error was
preserved.    





[12]Niemiec
testified the Texas Railroad Commission has record of sixty pipeline companies
in the area, all of which could be considered potential buyers.  

 





[13]While
Processing (a private company) made $13 million worth of improvements to the
property, the plant was built by Tonkawa in 1973 and the pipelines were not
owned by Processing.  In other words, the
condemnor did not make any enhancements on the property.  This fact distinguishes many of the cases
relied on by Pipeline.    





[14]Bolton
and Niemiec testified it might cost $38 million to move the plant and up to $52
million if business disruption was taken into account. 





[15]Pipeline
also cites extensively to Zwahr, 88
S.W.3d 623.  In that case, error stemmed
from the fact that the expert looked only to the part taken to determine that
the highest and best use of the property was for a pipeline easement.  Id. at
626.  However, unlike this case, the
property taken in Zwahr was not a
separate economic unit.  Id. 
Because the economic unit’s highest and best use was farmland or
rural-residential, and the expert failed to evaluate the whole economic unit,
his opinion was unreliable.  Id. at 626–27; Bulanek v.
Westtex 66 Pipeline Co., 209 S.W.3d 98, 99–100 (Tex. 2006). 
In this case, the part taken is a freestanding economic unit, as
demonstrated by its usage.  23.79 acres
had been used for the gas processing plant for years and the additional 4.5
acres were needed for access.  Zwahr, 88 S.W.3d at 626–27.





[16]“Where
there are different estates in the property or where the property is under a
lease to a third party, the valuation of the various estates or leasehold
interest is usually determined by ascertaining the market value of the property
with the improvements thereon as though owned exclusively by one party, and, in
the absence of damages to other property not taken, this ordinarily determines
the extent of the liability of the party condemning the property.”  Ware,
86 S.W.3d at 822–23.

 





[17]The
jury correctly assessed fair market value of the condemned property as a whole.





[18]It
is unlikely that zoning is involved as the property is located in a rural area
and does not appear to be within the jurisdiction of any municipality.